MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2024 ME 79
Docket:       Yor-23-265
Argued:       March 7, 2024
Decided:      December 19, 2024

Panel:        STANFILL, C.J., and MEAD and HORTON, JJ., and HJELM and HUMPHREY, A.R.JJ.

15 LANGSFORD OWNER LLC

v.

TOWN OF KENNEBUNKPORT

HORTON, J.

[¶1]  The Town of Kennebunkport appeals from a judgment of the Superior Court (York County, *Mulhern, J.*) vacating the Town's denial of applications by 15 Langsford Owner LLC (15 Langsford) for licenses under the Town's Short-Term Rental Ordinance (STRO).  In enacting the STRO, the Town did not include any provision allowing an appeal from the denial of a license application, *see* Kennebunkport, Me., Code ch. 129 (current through June 6, 2022), so we must determine whether the denial of 15 Langsford's applications is subject to direct review under Rule 80B of the Maine Rules of Civil Procedure, which ordinarily provides the "exclusive process" for judicial review of municipal permitting and licensing decisions, *Gorham v. Androscoggin Cnty.,* 2011 ME 63, ¶ 22, 21 A.3d 115.  We conclude both that the

2

Town's decision is reviewable pursuant to Rule 80B and that 15 Langsford was entitled to the permits based on the undisputed facts and the terms of the STRO. We therefore affirm the judgment of the Superior Court.

## I. BACKGROUND

[¶2] "The following facts are drawn from the Superior Court's decision and are supported by the record." *Hurricane Island Found. v. Town of Vinalhaven*, 2023 ME 33, ¶ 2, 295 A.3d 147. Between December 2020 and June 2021, 15 Langsford acquired eleven condominium units in Kennebunkport. Units one through nine are contained within a single structure, and units ten and eleven each occupy a freestanding structure. Each unit has one or more bedrooms, a kitchen, a living area, and at least one bathroom. Before 15 Langsford acquired the units, the freestanding units received Town approval as residential single-family dwellings and the structure containing units one through nine was approved as a legally nonconforming residential multiplex dwelling under the Town's Land Use Ordinance (LUO).[1] *See* Kennebunkport, Me., Code §§ 240-2.2, -4.10, -7.11 (Nov. 6, 2018). The units were governed by a Declaration of Condominium,

---

[1] The multiplex is legally nonconforming because it contains nine residential dwelling units despite the LUO's limitation of multiplex dwellings to eight units. Kennebunkport, Me., Code § 240-7.11(A) (Nov. 6, 2018).

which required that they be used for "residential purposes" and prohibited rentals "for transient or hotel purposes."

[¶3]  In April 2021, 15 Langsford began renting the units exclusively for occupancy for periods of less than thirty consecutive days.  At that time, the Town did not regulate short-term rentals of residential property.  The units were offered for rent on the website of 15 Langsford's parent company, which manages and operates the units and other resort properties in Kennebunkport. The parent company's website, which describes the parent company as offering "the best inns, resorts, and hotels in Kennebunkport," acts as a booking platform for 15 Langsford's units and the parent company's other properties. In addition to using a shared platform to book reservations at the units, short-term rental guests at the units receive access to amenities offered by the parent company at its other properties.

[¶4]  Also in April 2021, the Town contacted 15 Langsford, stating that it believed that 15 Langsford was violating the LUO and the Declaration of Condominium by using the units for transient rentals.  The Town explained in May 2021 that it viewed the rentals as "part of a larger commercial hospitality enterprise" operating without Planning Board approval required by the LUO. Without issuing a formal notice of violation, the Town recommended that

4

15 Langsford seek Planning Board approval pursuant to the LUO for use of the units as a "commercial lodging use" and comply with the Declaration of Condominium prohibition on transient rentals.

[¶5]  In response, on June 15, 2021, 15 Langsford amended the Declaration of Condominium to eliminate the prohibition on transient rentals and applied for Planning Board approval for use of the units as a hotel.

[¶6]  Also in June 2021, the Town began regulating short-term rentals through a licensing ordinance to "require the disclosure and licensing of short-term rentals operated within the Town of Kennebunkport," impose "modest performance standards," and limit the number of short-term rentals in the Town.  Kennebunkport, Me., Code § 129-1.  Under the STRO, "[l]egally existing residential dwelling units may be used as short-term rentals upon the issuance of a short-term rental license," but certain "lodging establishment uses," including uses for hotels and inns, are not eligible for STRO licenses.  *Id.* § 129-2(A), (C).  The STRO lacks any provision for appeals of decisions denying STRO licenses.[2]

[¶7]  In November 2021, 15 Langsford contacted the Town's code enforcement officer (CEO) about obtaining short-term rental licenses for its

---

[2]  The ordinance provides a right of appeal only from the *suspension or revocation* of a STRO license.  *See* Kennebunkport, Me., Code § 129-8(D) (current through June 6, 2022).

units under the STRO. The CEO reiterated the Town's position that 15 Langsford was using the units as a hotel or inn and, therefore, 15 Langsford would not be eligible to receive short-term rental licenses. Nonetheless, 15 Langsford submitted an application for a short-term rental license for each of its eleven units. It also withdrew its application for Planning Board approval for use of the units as a hotel.

[¶8] On May 12, 2022, the CEO issued letters denying each of the eleven applications because the units were not "[l]egally existing residential dwelling units" eligible to receive short-term rental licenses. *Id.* § 129-2(A). The CEO's letters reasoned that 15 Langsford had operated, advertised, and managed the units as "a commercial lodging establishment (e.g., an inn) under the unified management, control, and/or ownership of a hospitality business," without Planning Board approval, "in violation of Town ordinances."

[¶9] On June 7, 2022, 15 Langsford filed complaints in the Superior Court pursuant to Rule 80B and the Uniform Declaratory Judgments Act, 14 M.R.S. §§ 5951-5963 (2024), seeking review of the CEO's denial of the license applications.[3] The court (*Douglas, J.*) consolidated the appeals and, following

---

[3] 15 Langsford's request for declaratory relief and, in part, its request for Rule 80B relief focused on alleged constitutional infirmities regarding the STRO. 15 Langsford's facial challenges were dismissed, and the Superior Court concluded that its as-applied challenges lacked merit. 15 Langsford argues these constitutional issues only as alternative grounds to affirm the judgment.

oral arguments, the court (*Mulhern, J.*) entered a judgment on June 13, 2023, concluding that the CEO erred as a matter of law by determining that units rented by 15 Langsford were not "[l]egally existing residential dwelling units" within the meaning of section 129-2 of the STRO. Citing Rule 80B, the Superior Court vacated the decision of the CEO denying 15 Langsford's applications for short-term rental licenses, and the Town timely appealed to us. *See* M.R. Civ. P. 80B(n); M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶10] We first explain the basis for the trial court's jurisdiction to consider the Town's petition and then review 15 Langsford's eligibility for the short-term rental licenses.

### A. The Basis for the Superior Court's Jurisdiction

[¶11] We begin by identifying and examining the jurisdictional issues presented by the anomalous absence of a provision in the STRO that would allow an appeal from the denial of a license application.

---

Because we affirm the judgment based on our construction of the ordinances, we do not reach the constitutional issues. *See Jackson v. Inhabitants of Town of Searsport*, 456 A.2d 852, 854 n.10 (Me. 1983) ("A court should avoid expressing opinions on constitutional law whenever a nonconstitutional resolution of the issues renders a constitutional ruling unnecessary." (alteration and quotation marks omitted)).

[¶12]   In Maine, Rule 80B of the Maine Rules of Civil Procedure is ordinarily the exclusive procedural vehicle for judicial review of municipal permitting and licensing decisions.  *Gorham*, 2011 ME 63, ¶ 22, 21 A.3d 115 ("[W]hen direct review is available pursuant to Rule 80B, it provides the exclusive process for judicial review unless it is inadequate.").   However, Rule 80B itself does not confer jurisdiction to review a municipal action; it simply prescribes the procedure for judicial review when there is a separate basis for such jurisdiction.  *Lyons v. Bd. of Dirs. of Sch. Admin. Dist. No. 43,* 503 A.2d 233, 235 (Me. 1986) ("Rule 80B does not create an independent right to appeal any governmental action to the Superior Court.  It only provides a procedural avenue for those disputes in which the court has jurisdiction.").  Rule 80B itself defines the sources of jurisdiction to review a decision, stating that it applies when review "is provided by statute or is otherwise available by law."   M.R. Civ. P. 80B(a).   Review is "otherwise available by law" under Rule 80B(a) "if it is in the nature of that formerly available under the common law extraordinary writs, such as certiorari, mandamus or prohibition, adapted to current conditions."  *Dowey v. Sanford Hous. Auth.*, 516 A.2d 957, 959-60 (Me. 1986) (quotation marks omitted); *see* M.R. Civ. P. 81(c) ("The writs of scire facias, mandamus, prohibition, certiorari, and quo warranto are abolished.

Review of any action or failure or refusal to act by a governmental agency, including any department, board, commission, or officer, shall be in accordance with procedure prescribed by Rule 80B.").

[¶13] We have not regularly had to examine the common law writs to consider jurisdiction over actions governed by Rule 80B because review of decisions made under municipal ordinances is often available by statute. For example, if an ordinance provides for decisions by the municipality's CEO, planning board, or other decision-maker to be appealed to the municipal board of appeals, judicial review of the board of appeals's decision is available by statute. 30-A M.R.S. § 2691(1), (3)(G), (4) (2024). A different statute provides that "municipal land use decisions" issued pursuant to land use ordinances are appealable to the Superior Court pursuant to 30-A M.R.S. § 4482-A (2024).

[¶14] The absence in the STRO of any procedure allowing appeals to the Town zoning board of appeals (ZBA) rules out jurisdiction by virtue of 30-A M.R.S. § 2691. Jurisdiction under 30-A M.R.S. § 4482-A is doubtful at best because the Town has designated a different ordinance as its land use ordinance (LUO), Kennebunkport, Me., Code ch. 240, and has elected to regulate short-term rental licensing separately under the STRO, *id.* ch. 129. The Town's LUO does include provisions for appeals to the ZBA and then to Superior Court,

*id.* §§ 240-9.2(A)(1), -9.3(L), thereby establishing jurisdiction for Rule 80B review by virtue of 30-A M.R.S. § 2691 and 30-A M.R.S. § 4482-A. However, the Town did not include any provision in the STRO incorporating the LUO's appeal process.

[¶15] Neither the Superior Court nor the parties in their briefs to us addressed the basis for the court's jurisdiction. Nevertheless, because we cannot confirm statutory jurisdiction for Rule 80B review, we must consider whether Rule 80B review of the CEO's denial is "otherwise available by law" by virtue of the jurisdiction conferred by any of the common law writs. *Dowey*, 516 A.2d at 959 ("[I]f a jurisdictional question exists, we will not hesitate to address it on our own motion."). After hearing oral argument in this matter, we requested that the parties submit supplemental briefing regarding whether, pursuant to M.R. Civ. P. 80B(a), judicial review of the CEO's decision "is provided by statute or is otherwise available by law."

[¶16] In response to our request for supplemental briefing, neither party advanced a statutory argument for Rule 80B review. The Town did not address whether review is "otherwise available by law" and argued that the Superior Court lacked jurisdiction because there is no statutory basis for Rule 80B review. 15 Langsford argued that review pursuant to Rule 80B is "otherwise

available by law" because the CEO's denial of its applications was an adjudicatory decision of the kind formerly subject to judicial review by virtue of the writ of certiorari.

### 1. Judicial Review "Otherwise Available by Law" Before Adoption of Rule 80B

[¶17]  Until they were abolished by an amendment to Rule 81 of the Maine Rules of Civil Procedure in 1967, *see* M.R. Civ. P. 81(c); M.R. Civ. P. 81 Advisory Committee's Note December 31, 1967, the common law writs of mandamus, certiorari, and prohibition enabled judicial review of governmental action in various contexts.  "Prohibition was issued only under extreme necessity 'to direct any inferior tribunal to cease abusing its power or usurping judicial functions that did not rightly belong to it.'"  *Lyons*, 503 A.2d at 236 n.3 (quoting Field & McKusick, *Maine Civil Practice* § 81.6 at 617 (1st ed. 1959)). The two writs under which courts usually reviewed decisions of governmental officers and agencies were the writ of certiorari and the writ of mandamus, with certiorari functioning as the vehicle for judicial review of governmental decisions involving a discretionary and quasi-judicial adjudication of rights, *Carter v. Wilkins*, 160 Me. 290, 293-94, 203 A.2d 682, 683-84 (1964); *Cunningham v. Kittery Planning Bd.*, 400 A.2d 1070, 1077 (Me. 1979), and mandamus functioning to compel the performance of a ministerial act, *Casco*

*N. Bank, N.A. v. Bd. of Trustees of Van Buren Hosp. Dist.,* 601 A.2d 1085, 1087 (Me. 1992); *see also Carroll v. City of Portland,* 1999 ME 131, ¶ 9 n.6, 736 A.2d 279 (construing "ministerial" to mean "of or designating a mandatory act or duty admitting of no personal judgment or discretion in its performance" (alteration and quotation marks omitted)).  We have summarized when mandamus is and is not available to compel governmental action:

> When the law requires the public officer to do a specified act, in a specified way, upon a conceded state of facts, without regard to his own judgment as to the propriety of the act, and with no power to exercise discretion, the duty is ministerial in character and performance may be compelled by mandamus if there is no other remedy.  When, however, the law requires a judicial determination to be made, such as the decision of a question of fact, or the exercise of judgment in deciding whether the act should be done or not, the duty is regarded as judicial and mandamus will not lie to compel performance.

*Young v. Johnson,* 161 Me. 64, 70, 207 A.2d 392 (1965) (quotation marks omitted).

[¶18]  Similarly, we have explained the context in which review by certiorari applies: "Whether an act is judicial or quasi-judicial so as to be reviewable by certiorari depends on the nature of the act performed, rather than on the character of the officer or body performing it.  Judicial action is an adjudication on the rights of the parties who, in general, appear or are brought

before the tribunal by notice or process, and on whose claims some decision or judgment is rendered." *Lyons*, 503 A.2d at 236.

### 2. The Common Law Basis for Review of a Refusal to Perform the Ministerial Act of Issuing a Permit or License

[¶19] Because the nature of the decision, rather than the identity of the decision maker, dictated which common law writ was the vehicle for review, we next examine the nature of the CEO's decision to deny 15 Langsford's permit applications. A CEO's decisions under an ordinance can be either discretionary or ministerial, depending on whether the decisions involve discretionary determinations of fact or non-discretionary applications of the ordinance. In situations in which a CEO has made a discretionary factual determination in a non-adjudicatory manner, i.e., without affording notice and opportunity to be heard or making findings of fact sufficient to enable judicial review, we have remanded the matter for the CEO to convene a proceeding and render findings of fact. *See Mills v. Town of Eliot,* 2008 ME 134, ¶ 20, 955 A.2d 258; *29 McKown LLC v. Town of Boothbay Harbor***,** 2022 ME 38, ¶ 13, 277 A.3d 364. In *Mills,* for example, the CEO's issuance of the disputed building permit required factual determinations, but the CEO's "only determination was his decision to issue the building permit." *Mills,* 2008 ME 134, ¶ 18, 955 A.2d 258. We therefore

"remand[ed] the case to the CEO to make sufficient and clear findings of fact relevant to the issuance of the building permit at issue in th[e] case." *Id.* ¶ 20.

[¶20]   The STRO provides, "If the Town Clerk, or the Town Clerk's designee, in consultation with" the CEO reviews an application and "determines that the proposed short-term rental application complies with the short-term rental standards, the Town Clerk shall issue the applicant a short-term rental license."  Kennebunkport, Me., Code § 129-5(F).  Whether a proposed rental complies with all ordinance standards might in some cases involve issues of fact, but here, as the court noted, there were no disputed issues of fact that required the CEO to find facts in an adjudicatory capacity and make a discretionary determination.[4]  The only issue before us—whether the units meet the STRO's definition of "[l]egally existing residential dwelling units"— centers solely on the interpretation of the ordinance, which the court properly addressed de novo, without deference to the CEO's interpretation.  *Id.* § 129-2(A); *see, e.g.*, *Tominsky v. Town of Ogunquit*, 2023 ME 30, ¶ 22, 294 A.3d

---

[4] The STRO requires that applicants pay an application fee and submit information regarding the location of the property, contact information for property owners, and documentation that the property meets performance standards involving building safety, sanitary waste disposal, and parking.  Kennebunkport, Me., Code §§ 129-5(A), (B), -6, -7.  The parties do not dispute that 15 Langsford submitted the required materials and demonstrated compliance with the STRO performance standards.  There is likewise no disagreement that the units had been made commercially available for short-term occupancy before the STRO's enactment, the question being whether they were being operated at the time as a hotel or inn as those terms are used in the LUO.

14

142. The purely legal nature of the issue means that, if the CEO's interpretation of the STRO was incorrect, the grant of licenses to 15 Langsford would be a ministerial, non-discretionary act that 15 Langsford is entitled to require the CEO to perform.

[¶21] "It is well settled that a writ of mandamus can issue against a public officer or body to compel performance when the petitioners have a clear legal right to the performance of the specific act sought to be compelled, and the defendants have a clear legal duty to perform such act, and the act is ministerial." 5 Patricia E. Salkin, *American Law of Zoning* § 43:1 (5th ed.), Westlaw (database updated Nov. 2024). Accordingly, before the advent of Rule 80B, we endorsed the use of mandamus to compel the ministerial issuance of a municipal building permit after it was denied:

> Mandamus is available to the landowner to compel the administrative officer to do his duty as required by law. Perhaps the most frequent group of cases where mandamus is employed by landowners is where the building inspector *refuses a permit which he ought lawfully to grant.*

*Casino Motor Co. v. Needham,* 151 Me. 333, 339-40, 118 A.2d 781, 784 (1955) (emphasis added and quotation marks omitted).[5]

---

[5] Mandamus was historically not available to compel the performance of an act if the required act had already been performed. *See State ex rel. Martin v. Greene*, 129 N.E.3d 419, 421 (Ohio 2019) ("Mandamus will not lie to compel an act that has already been performed." (quotation marks omitted)); *State ex rel. Cassel v. Johnston*, 185 N.E. 278, 279 (Ind. 1933) ("[A]s the office of the writ of

[¶22]  For these reasons, we conclude that direct review of the CEO's denial of 15 Langsford's applications pursuant to Rule 80B is "otherwise available by law" by virtue of the common law writ of mandamus, *see Your Home, Inc. v. City of Portland*, 505 A.2d 488, 489 (Me. 1986) ("An action pursuant to Rule 80B may lie where the extraordinary writ of mandamus was formerly available.").

## B.    15 Langsford's Eligibility for Short-Term Rental Licenses

[¶23]  "The interpretation of a local ordinance is a question of law, and we review that determination de novo." *Rudolph v. Golick*, 2010 ME 106, ¶ 8, 8 A.3d 684 (quotation marks omitted).  When construing an ordinance, we will not redefine terms that the ordinance expressly defines, *id.* ¶ 9, and we will look to the plain, common meaning of undefined terms "unless the context clearly

---

mandate is to compel action, it will not issue if the duty sought to be enforced has already been done.").  If the required act is a discretionary one, "[p]ublic officers can be directed to act, but not how to act," and once they have acted, review through mandamus is no longer available, although review through certiorari may be.  *Rogers v. Brown*, 135 Me. 117, 119, 190 A. 632, 633 (1937).  However, if the required act is "ministerial, then the mandamus will direct *the specific act* to be performed."  *Id.* (emphasis added).  Thus, if the required ministerial act is the grant of a permit or license, a denial or refusal of the permit or license does not render mandamus unavailable because the required "specific act" has yet to be performed.  *See Casino Motor Co. v. Needham,* 151 Me. 333, 339-40, 118 A.2d 781, 784 (1955).  Here, the act that 15 Langsford seeks to compel the CEO to perform is not to act on its license applications, which the CEO has already done, but to grant the licenses, which the CEO has affirmatively declined to do.  *See Kelly v. Curtis*, 287 A.2d 426, 429 (Me. 1972) (indicating that mandamus would lie to compel ministerial action when an action *had been* taken but was legally incorrect).  Because there are no factual issues requiring a discretionary determination, the grant of the licenses would be a ministerial act, assuming 15 Langsford's interpretation of the STRO is correct. Accordingly, the CEO's denial of 15 Langsford's application does not preclude judicial review in the nature of mandamus.

16

indicates otherwise," *Jade Realty Corp. v. Town of Eliot*, 2008 ME 80, ¶ 9, 946 A.2d 408 (quotation marks omitted). We construe ordinance terms "reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole." *Id.* (quotation marks omitted).

[¶24] The STRO's stated purposes are "to require the disclosure and licensing of short-term rentals" in the Town and to "monitor and track" their proliferation to avoid unduly burdensome effects on the Town's neighborhoods. Kennebunkport, Me., Code § 129-1. Under the ordinance, "[l]egally existing residential dwelling units may be used as short-term rentals upon the issuance of a short-term rental license for the premises in accordance with the requirements" of the STRO. *Id.* § 129-2(A). "Short-term rental" under the ordinance is defined, circularly, as "[t]he use, control, management or operation of a legally existing residential dwelling unit offered for rent for transient occupancy for dwelling, sleeping or lodging purposes by short-term rental guests for a tenancy of less than 30 consecutive days, for compensation, directly or indirectly, excluding," among other establishments, hotels and inns. *Id.* § 129-3.

[¶25] Without a license, short-term rental of any property is prohibited. *Id.* §§ 129-2(B)(1), -4(A). Additionally, certain "lodging establishment uses,"

including uses as hotels and inns, are exempt from the ordinance and do not need short-term rental licenses to operate. *Id.* § 129-2(C).

[¶26] The STRO contains a transitional provision for licensing properties that were used for short-term rentals before the Town enacted the ordinance. *Id.* § 129-5(E). That provision provides, in relevant part, that "[p]ersons or entities who operated a legally existing residential dwelling unit as a short-term rental" prior to the effective date of the STRO must obtain a short-term rental license and must demonstrate that "the premises were previously used for short-term rental use . . . for a period of less than 30 consecutive days per tenancy and for at least 14 total days" in 2019, 2020, or 2021.[6] *Id.*

[¶27] The STRO does not define "legally existing residential dwelling unit," the term at the crux of the parties' dispute.

[¶28] 15 Langsford contends that because the units had been approved as single-family and multiplex residential dwellings under the LUO when 15 Langsford began offering them for transient occupancy, and because a property must have been used for transient occupancy for commercial gain prior to enactment of the STRO in order to be eligible to receive a short-term rental license, the units were "legally existing residential dwelling units" during

---

[6] The record demonstrates, and the parties do not dispute, that in 2021 15 Langsford rented each unit for at least fourteen days but for fewer than thirty consecutive days per tenancy.

18

the time that 15 Langsford offered them as short-term rentals. In addition, 15 Langsford contends that how a property is managed or advertised is not relevant to whether a property is eligible for a short-term rental license under the STRO.

[¶29] The Town argues that 15 Langsford's units were not "legally existing residential dwelling units" under the STRO because when the units were offered for short-term rental prior to enactment of the STRO, 15 Langsford was operating as a hotel or inn in violation of the LUO, and the units therefore were neither "legally existing" nor "residential." In support of this argument, the Town emphasizes that 15 Langsford is owned by an entity that manages resort properties, that the units were advertised in concert with those resort properties, and that guests renting the units received access to the resort properties.

[¶30] Under the LUO, a hotel is a "building or group of buildings having 10 or more guest rooms in which lodging or meals and lodging are offered for compensation." Kennebunkport, Me., Code § 240-2.2. Similarly, an inn is a "business establishment having nine or fewer guest rooms in which lodging is offered to guests for compensation."[7] *Id.* We have recognized that hotels and

---

[7] At various times throughout 2021, 15 Langsford had between nine and eleven units available for rent.

similar uses under similar definitions are characterized by transient occupancy, and the Town has, in line with these definitions, chosen to define hotels and inns with reference to "guest rooms." *See Jordan v. City of Ellsworth*, 2003 ME 82, ¶ 10, 828 A.2d 768.[8] In contrast, the STRO defines "dwelling unit" as "[o]ne or more rooms arranged for complete, independent housekeeping purposes with space for living and sleeping; space or facilities for eating or cooking; and provisions for sanitation." Kennebunkport, Me., Code § 129-3.[9]

[¶31] Each of 15 Langsford's units contains a living space, a kitchen, at least one bedroom, and at least one bathroom. They are plainly more than "guest rooms" and are arranged and intended for "complete, independent housekeeping purposes," i.e., residential occupancy. *See, e.g.*, *Town of Conway v. Kudrick*, 301 A.3d 823, 829 (N.H. 2023); *Heef Realty & Invs., LLP v. City of*

---

[8] In *Jordan v. City of Ellsworth*, we affirmed a town planning board determination that a multi-unit property used for a mix of short-term and long-term tenancy was not a hotel. 2003 ME 82, ¶¶ 3, 13, 828 A.2d 768. Although, as the Town notes, we recognized in *Jordan* the nuanced distinction between residential dwelling units and hotels, that decision, which focused in part on whether an occupant's residence was temporary, does not control the outcome of this appeal. *Id.* ¶ 12. Here, unlike in *Jordan*, the Town has effectively conferred the right to short-term rental licenses upon 15 Langsford's units by defining the terms "hotel" and "inn" in terms of "guest rooms," Kennebunkport, Me., Code § 240-2.2, thereby excluding 15 Langsford's units—which are not "guest rooms"—from those definitions, and by deeming "[l]egally existing residential dwelling units" such as Langsford's eligible for licenses under the STRO, *id.* § 129-2(A).

[9] Although it is the STRO's definition that determines eligibility for short-term rental licenses, the LUO has a similar definition of "dwelling unit" as "[o]ne or more habitable rooms arranged, designed or intended to be used, or used[,] as a complete housekeeping unit . . . with independent living, cooking, sleeping, bathing and sanitary facilities." Kennebunkport, Me., Code § 240-2.2.

20

*Cedarburg Bd. of Appeals*, 861 N.W.2d 797, 801-02 (Wis. Ct. App. 2015); *cf.* *Morgan v. Townsend*, 2023 ME 62, ¶¶ 21-23, 302 A.3d 30 (recognizing that "the word 'residential' in the context of deed restrictions" generally does not preclude short-term rentals).[10]  They have never been within the LUO definitions of "hotel" and "inn" and were not in violation of the LUO.[11]  Instead, they were legally existing residential single-family and multiplex dwellings as defined in the LUO and the STRO, and were used for short-term rentals during the period required to qualify for STRO licenses.  *See* Kennebunkport, Me., Code §§ 129-3, -5(E), 240-2.2.  Because the Town's only reason for denying 15 Langsford's applications for short-term rental licenses is that the units had supposedly been operated as a hotel or inn in violation of the LUO, 15 Langsford is entitled to the licenses.

The entry is:

Judgment affirmed.

---

[10]  The Town relies on *Morgan v. Townsend*, 2023 ME 62, 302 A.3d 30, to distinguish between residential and commercial use.  In that case, however, we expressly declined to conclude that short-term rentals are inconsistent with residential use and instead held that the use made of the property was impermissible because a restrictive covenant prohibited "trade or business" from being conducted on the property.  *Id.* ¶¶ 3, 21-23, 26, 33.  In the instant case, there is no similar blanket prohibition on the use of residential property for a commercial purpose; in fact, the STRO requires that residential property have been previously rented for commercial gain to qualify for a short-term rental license.  Kennebunkport, Me., Code §§ 129-3, -5(E).

[11]  In addition, although the Town suggests that 15 Langsford's use of the units was improper because the Declaration of Condominium governing the units prohibited transient rentals, each unit was rented, as required by the STRO, for at least fourteen days in 2021 after 15 Langsford amended the Declaration to remove the prohibition.

Amy K. Tchao, Esq. (orally), Melissa A. Hewey, Esq., and Oliver Mac Walton, Esq., Drummond Woodsum, Portland, for appellant Town of Kennebunkport

Daniel J. Murphy, Esq. (orally), Bernstein, Shur, Sawyer & Nelson, P.A., Portland, for appellee 15 Langsford Owner LLC

York County Superior Court docket number AP-2022-17
<small>FOR CLERK REFERENCE ONLY</small>